UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| RANATA FRANK, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>THE CITY OF ST. LOUIS,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>) Case No. 4:20-cv-597<br>)<br>)<br>)<br>)<br>) |

## CLASS ACTION COMPLAINT

1. It is impossible for an individual to follow a "Stay at Home" order when he or she is experiencing homelesness and cannot access a shelter bed. Instead, an unhoused person has no choice but to make do and seek shelter in public spaces, often in violation of laws related to park curfews and sleeping in tents.

2. On Wednesday, April 29, the City of St. Louis issued an order to "close" tent encampments in the public parks between Market and Chestnut Streets in downtown St. Louis. With less than 48-hours notice, unhoused individuals were ordered to remove their tents and personal belongings by Friday, May 1 at 10:00 a.m. By remaining in the park, the unhoused risk citation or arrest for merely existing, as they have nowhere else to go.

3. The City of St. Louis does not have adequate shelter space for its unhoused community. As the Saint Louis Area Regional Commission on Homelessness (SLARCH) estimates, St. Louis currently has between 500 and 600 unsheltered individuals. Ex. A, ¶ (Huffman Declaration).

4. Although the City has added 200 beds since the COVID-19 outbreak, those beds simply make up for the loss of shelter beds that occurred when local shelters reduced their capacity in order to comply with social distancing guidelines. Ex. A, ¶ (Huffman Declaration).

5. The City, itself, has admitted that it does not have enough shelter beds. On April 30, Amy Bickford, representing the Department of Human Services, told the St. Louis City Continuum of Care that "the City knows the need is greater than the capacity," and reported that 98 people were currently on the waiting list for new shelter beds. Ex. A, ¶ (Huffman Declaration).

6. Unhoused individuals in St. Louis have no choice but to seek shelter in public spaces, because the City of St. Louis has inadequate shelter space. Nevertheless, the City of St. Louis has ordered people living in parks along Market Street to vacate the premises, under threat of punishment.

7. This action is brought by persons who are experiencing homeless in the City of St. Louis and who face arrest or citation for not leaving the Market Street encampments.

8. Plaintiff and members of the proposed class bring this action for injunctive relief to avoid being deprived of their freedom from cruel and unusual punishment under the Eighth Amendment of the United States Constitution.

## JURISDICTION AND VENUE

9. This is a civil rights action arising under 42 U.S.C. §1983 and the Eighth Amendment to the United States Constitution.

10. Injunctive relief is authorized by 28 U.S.C. §2201, and Fed. R. Civ. P. 65.

11. This Court has jurisdiction over the matter pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1343.

12. Venue in this Court is proper pursuant to 28 U.S.C. §1391.

### III. PARTIES

13.     Plaintiff Ranata Frank (hereafter "Ms. Frank") is a 39-year-old woman who is currently experiencing homelessness. Ex. E, ¶ (Frank Declaration). Ms Frank is staying in downtown St. Louis, Missouri at the Market Street encampments. *Id.* Ms. Frank has lacked stable housing since November 2019, when she moved to St. Louis from Peoria, Illinois. *Id.*

14.     Upon moving to St. Louis, Ms. Frank worked for a temporary staffing agency, but struggled to keep her job due to the outbreak of COVID-19. *Id.* Ms. Frank now donates her plasma twice a week, earning $15 per donation, to offset her loss of employment. *Id.*

15.     Ms. Frank has consistently sought shelter and housing assistance since she became unhoused in November 2019. *Id.* While living at the Market Street encampments, Ms. Frank signed up for a shelter bed with City officials who were conducting outreach. *Id.* Ms. Frank has still not been provided a shelter bed, despite signing up for one weeks ago. *Id.*

16.     Defendant City of St. Louis is a municipality and a county organized under the laws of the State of Missouri.

### STATEMENT OF FACTS

### CDC guidelines instruct health departments to refrain from encampment evictions during the COVID-19 pandemic unless individual housing units are available for unhoused individuals

17.     In response to the COVID-19 pandemic, the Centers for Disease Control and Prevention (CDC) issued interim guidance pertaining to people living in homeless encampments. *People Experiencing Homelessness and COVID-19: Interim Guidance*, Centers for Disease Control and Prevention (Mar. 22, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/homeless-shelters/unsheltered-homelessness.html (hereinafter *CDC, Homelessness Interim Guidance*). The CDC guidelines instruct local health departments to "not

clear encampments during community spread of COVID-19," unless enough "*individual* housing units are available" *Id.* (emphasis added). The stated rationale is that "clearing encampments can cause people to disperse throughout the community and break connections with service providers" and therefore "increase[] the potential for infectious disease spread." *Id.*

18. CDC Homelessness Interim Guidance also places responsibility upon local health officials to provide services and support for people in encampments, in order to protect the health and safety of those living there. In particular, the guidelines instruct local health officials to "[e]nsure nearby restroom facilities have functional water taps, are stocked with hand hygiene materials (soap, drying materials) and bath tissue and remain open to people experiencing homelessness 24 hours per day." When these facilities are unavailable, local officials should "provide access to portable latrines with handwashing facilities for encampments of more than 10 people." *Id.*

**The City of St. Louis does not have adequate shelter for its unhoused community**

19. The City of St. Louis does not have adequate shelter space for its unhoused community. According to the St. Louis Area Regional Commission on Homelessness (SLARCH), 780 people without homes were engaged with St. Louis City nonprofit organizations in some capacity, as of April 2020.[1] Of those individuals connected with city nonprofits, 480 individuals resided in temporary shelter, while another 300 were unsheltered.[2] Moreover, SLARCH reported that there were "at least 200 more people without homes in the city" who were not currently engaged with city nonprofits, and thus not accounted for in the Homeless

---

[1] *St. Louis Homlesness COVID-19 Response Plan*, St. Louis Area Regional Commission on Homelessness, https://www.dropbox.com/s/jl8ms6b9668snyc/St%20Louis%20Homelessness%20COVID19%20Response%20Plan%20Draft.docx?dl=0&fbclid=IwAR3MHnd32yDU1fRbEqZRBM9_w_Kpo-qat8s6vyDG6-zhwIaqVNKrlqS8lQQ, at page 1
[2] *Id* at page 4.

Management Information System (HMIS).³ These estimates put the minimum number of unsheltered individuals at 500 individuals in St. Louis City as of April 2020.

20. During the COVID-19 pandemic, the City of St. Louis has struggled to maintain its shelter capacity, much less make the needed expansion to provide shelter space for all unsheltered individuals. According to SLARCH, there are normally around 516 beds available for unhoused individuals in St. Louis. Ex. A, ¶ (Huffman Declaration). However, due to social distancing requirements, the number of shelter beds fell to 315 beds, as shelters attempted to adequately comply with social distancing guidelines. Ex. A, ¶ (Huffman Declaration).

21. In a press release issued on April 29, 2020, the City of St. Louis reports that it opened 200 additional shelter beds in response to the COVID-19 pandemic.⁴ But these "new" beds merely keep the City at approximately pre-COVID numbers, as discussed above. Moreover, the vast majority of these 200 "new" beds have been filled by already sheltered homeless individuals, who had to be relocated due to efforts to thin existing shelter beds. The City's own press release indicates that it only placed "40 unhoused individuals into shelter and housing" over the past few weeks.⁵

22. It is difficult to state precisely the number of shelter beds that are available in St. Louis on any given day because the City either fails to keep track of or publish such numbers. That said, on April 30, 2020, City employee Amy Bickford told the St. Louis City Continuum of Care that "the City knows the need is greater than the capacity" and informed the group that 98 people are currently on the City's referral list, waiting for shelter. Ex. A, ¶ (Huffman

---

³ *Id* at page 1.
⁴ *City of St. Louis Issues New Order to Protect the Public's Health and Safety During COVID-19 Outbreak,* City of St. Louis available at https://www.stlouis-mo.gov/government/departments/health/news/new-order-to-protect-public-health-and-safety-encampments.cfm.
⁵ *Id.*

5

Declaration). As the Chief Program Manager at the Department of Human Services-Homeless Service Division, Ms. Bickford is tasked with overseeing the intake process for the City's "new" shelter beds. Ex. A, ¶ (Huffman Declaration)

23. The experience of unhoused individuals and outreach workers confirms the lack of adequate shelter. Outreach workers indicated that despite helping dozens of unhoused individuals apply for housing via the City's Google Form intake process[6] over the past few weeks, many of the individuals they helped still have not heard back from City officials about the availability of a shelter bed. Ex. B, ¶ (Cohen Declaration) ; Ex. C, ¶ (Punch Declaration).

**The City of St. Louis has targeted the Market Street encampments with police enforcement and eviction despite encampments existing across the city**

24. On March 21, 2020, Dr. Frederick Echols, the Director of the City of St. Louis Department of Health, issued Health Commissioner's Order No. 5, which ordered all individuals living in the City of St. Louis "to remain at home," with limited exceptions.[7] The City's stay-at-home order does not reference or include any exception for people experiencing homelesness.[8] The order went into effect on March 23, 2020 at 6:00 pm.[9]

25. On March 25, 2020, Saint Louis Missouri Police Department (SLMPD) Chief John Hayden issued an internal directive stating that "Officers should refrain from clearing encampments during the spread of COVID-19," in accordance with CDC recommendations. Ex. B, ¶ (Cohen Declaration)

---

[6] *Covid-19 Shelter Response- Request for Shelter,* available at
https://docs.google.com/forms/d/e/1FAIpQLSds6TUMHxS4HissPEUNDG5KuWvWvhaUINxYjlWy2VKY7IRYag/viewform

[7] March 21, 2020 Stay Home- Essential Activities Only Order, Health Commissioner's Order 5, available at https://www.stlouis-mo.gov/government/departments/health/communicable-disease/covid-19/documents/upload/Health-Commission-s-Order-5-03-21-2020.pdf

[8] *Id.*

[9] *Id.*

6

26. With both inadequate shelter space and individual housing units available, on April 4, 2020--nearly a month after the first person tested positive for COVID-19 in the St. Louis region[10]--unhoused individuals living in parks near Market Street began setting up tents provided to them by volunteer outreach workers. Two encampments emerged: one near 14th and Market Street, which consisted primarily of single men, and another near Tucker Boulevard and Market Street, which became known as the "family camp." (The camps are hereafter collectively referred to as the "Market Street Encampments") Ex. B, ¶ (Cohen Declaration)

27. Despite not having adequate shelter space for its unhoused population, and in direct contravention of CDC guidelines and Chief Hayden's March 25 directive, SLMPD officers entered the two encampments on multiple occasions in the following days, and threatened the residents with arrest if they did not comply with their, often conflicting, orders. SLMPD officers often did not wear personal protective equipment (PPE) when they entered the encampments. Ex. B, ¶ (Cohen Declaration)

28. In particular, on April 6, 2020, people living in the family encampment at Tucker and Market were told by officers that they would be arrested if they did not move and join the larger encampment at 14th and Market. Ex. D, ¶ (Williams Declaration). The family camp happens to be located across the street from City Hall.

29. Two days later, on April 8, 2020, officers returned to the smaller Tucker and Market encampment. This time, instead of telling them to join the larger encampment, SLMPD officers told residents that the park curfew would be enforced in two days. Ex. D, ¶ (Williams Declaration).

---

[10] Nicole Sanders, One month passes since first COVID-19 case reported in St. Louis County, KMOV, April 7, 2020, available at
https://www.kmov.com/news/one-month-passes-since-first-covid-19-case-reported-in-st-louis-county/article_8b8cdb16-78c3-11ea-9762-374386def558.html

30. Later that same day, a City official, Steve Conway, entered the encampment and told residents that they had to leave by 10:00 p.m. (when the park curfew goes into effect) and that any belongings left behind would be collected at 4:00 am. Ex. D, ¶ (Williams Declaration). Mr. Conway handed residents of the smaller Tucker and Market encampment a piece of paper that directed them to the St. Patrick Center for an intake and assessment to obtain shelter. Ex. D, ¶ (Williams Declaration). Residents were handed this information despite the fact that St. Patrick's Center was closed at the time because it was under quarantine. Ex. D, ¶ (Williams Declaration).

31. At 4:00 a.m. on April 9, 2020, SLMPD officers arrived at the larger encampment at 14th and Market and told residents that they had to leave. Doyle Murphy, *Homeless Refuse to Leave St. Louis Camp, Despite 4 a.m. Police Visit*, Riverfront Times, April 9, 2020 available at https://www.riverfronttimes.com/newsblog/2020/04/09/homeless-refuse-to-leave-st-louis-camp-despite-4-am-police-visit?fbclid=IwAR1nfRA7iWsjfezNbeB1g19p1zxZUNDphooM4-c6STjE84sOfrNBqiZAIRo. Eight or nine park employees accompanied the offices. *Id*.

32. Upon information and belief, despite other encampments existing throughout the City of St. Louis, SLMPD officers did not threaten members of other encampments with arrest if they did not disburse.

**The City of St. Louis has threatened unhoused individuals with punishment or arrest if they do not vacate the Market Street encampments despite still not having adequate housing available**

33. On Wednesday, April 29, 2020, the City of St. Louis renewed its efforts to clear the Market Street encampments when Dr. Echols issued a Notice of Violations and Order to Vacate for the encampments "located along Market and Chestnut Streets, from Tucker to 18th Street." April 19, 2020 Notice of Violations and Order to Vacate, available at

8

https://www.stlouis-mo.gov/government/departments/health/communicable-disease/covid-19/documents/upload/Judge-Tents-NOTICE-OF-VIOLATIONS-and-Order-Signed-PDF.pdf.

34. The Order to Vacate requires unhoused individuals to vacate the park and remove their "tents and personal belongings" by 10 a.m, Friday, May, 1, 2020. *Id*.

35. The Order indicates that unhoused individuals are in violation of City ordinances by seeking shelter in the park. *Id.* In particular, the City states that people are violating park curfew by sleeping in the park after 10 pm. *Id.* The order also states that "tents may not be used for residential occupancy under the ordinance of the City of St. Louis." *Id.*

36. City officials posted the Order to Vacate on the tents of people living in the Market Street encampments in the afternoon of April 29, 2020, with less than 48-hours notice of the order to vacate at 10 am on Friday, May 1, 2020. Ex. B, ¶ (Cohen Declaration)

37. The Order claims that "[e]nough housing/shelter openings are available to house the approximately fifty individuals who have been sleeping in the tents in the current encampment." This is despite the fact that the following morning, on April 30, 2020, Chief Program Manager at Department of Human Services-Homeless Service Division Amy Bickford informed CoC providers that there are 98 people on the City's referral list waiting for shelter. Ex. A, ¶ (Huffman Declaration)

38. People sleeping in the Market Street encampments will be subject to punishment and arrest if they do not vacate the Market Street public parks, despite the fact there is not enough shelter beds for them, and that such an order directly contravenes CDC guidelines regarding encampments.

## CLASS ACTION ALLEGATIONS

39.     The named Plaintiffs bring the Claims in this action, on behalf of themselves and all others similarly situated, as a class action under Federal Rules of Civil Procedure 23(a)(1)-(4) and 23(b)(2).

40.     Under Federal Rule of Civil Procedure 23(a), certification of a class is appropriate where:

> the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.
> Fed. R. Civ. P. 23(a).

41.     This class is composed of approximately 50 homeless residents who are currently living in temporary tent shelters at the Market Street encampments in downtown St. Louis.

42.     This action is brought and may properly be maintained as a class action pursuant to Rule 23(a)(1)–(4) and Rule 23(b)(2) of the Federal Rules of Civil Procedure.

43.     This action satisfies the requirements of numerosity, commonality, typicality and adequacy. Fed. R. Civ. P. 23(a).

### Numerosity and Impracticability of Joinder

44.     The proposed class is composed of all individuals currently experiencing homelessness who are residing in the Market Street encampments.

45.     There are approximately 50 individuals currently living in the public park.

46.     Joinder is impracticable because of the numerosity of the class and their impoverished economic status.

## Commonality

47. Common questions of law and fact exist as to all members of the class.

48. The named Plaintiffs seek common injunctive relief concerning whether the Defendant's plans to forcibly remove them from the public park under the threat of punishment mandates relief requiring.

49. Plaintiffs' claims raise common legal and factual questions arising from Defendant's April 29, 2020 Notice of Violation and Order to Vacate issued by the City of St. Louis and its plan to forcibly remove individuals experiencing homelessness from the Market Street encampments. Resolution of these legal and factual issues will determine whether all of the members of the class are entitled to the constitutional relief that they seek.

50. Among the most important common questions of fact for the class are:

   a. Whether the City of St. Louis adequately planned to accommodate the homeless residents in St. Louis when it issued its Stay-At Home Order;

   b. How the City of St. Louis planned to provide safe and adequate shelter to accommodate homeless residents in St. Louis when it issued its Stay-At-Home Order;

   c. Whether the City of St. Louis relied on guidance from the Center for Disease Control (CDC) in planning and issuing its Stay-At-Home Order;

   d. Whether the Defendant provided adequate and safe shelter beds for those homeless residents living at the public park;

   e. Whether there is currently a waitlist for homeless residents to access shelter beds provided by the City of St. Louis;

    f.   Whether Defendant has threatened to punish homeless residents living in the Market Street encampments;

    g.   What are Defendant's motivations behind issuing the April 29, 2020 Order to Vacate; and

    h.   Why is this Order being issued only pertaining to the Market Street encampments rather than other encampment residents in the City of St. Louis?

51.    Among the most important common questions of law are:

    a.   Whether an individual has a right to live in a public park without interruption when the City of St. Louis has failed to provide adequate shelter space to that individual during a time of public health crisis;

    b.   Whether threatening to forcibly remove the homeless residents living in the public park with punishment violates a homeless resident's Eighth Amendment Rights;

    c.   Whether threatening to physically remove a homeless resident living in the public park by arrest violates a homeless resident's Eighth Amendment Rights, and;

    d.   Whether the Defendants actions are a violation of the Eighth Amendment by threatening punishment against a group of individuals based on their status as unhoused individuals.

### Typicality

52.    The Named Plaintiff's claims are typical of the claims of the other members of the class. Each class member is living in the public park and is currently experiencing homelessness due to their poverty. Each class member has received a notice to vacate the public park by May 1, 2020 at 10:00 AM and is currently at threat of being punished if they do not vacate the park. The answer to whether the Defendant's planned attempt to remove individuals from the park and

threat to punish those who are not willing to leave are unconstitutional will determine the specific claim and specific relief sought by the Named Plaintiff and every other class member. All class members seek the same injunctive relief.

### Adequacy

53. The Named Plaintiff is an adequate representative of the class because his/her/their interests in the vindication of the legal claims he/she/they raise are entirely aligned with the interests of the other class members, each of whom has the same basic constitutional claims. The Named Plaintiff is a member of the class, and his/hers/their interests do not conflict with those of the other class members.

54. There are no known conflicts of interest among members of the proposed class. All of the members of the class have a similar interest in having their constitutional rights against cruel and unusual punishment protected.

55. Plaintiffs are represented by attorneys from ArchCity Defenders. Plaintiff's counsel has experience litigating complex civil rights matters in federal court and extensive knowledge of representing individuals experiencing homelessness or housing instability.

56. The interests of the members of the class will be fairly and adequately protected by the Plaintiff and their attorneys.

### Injunctive Relief — Rule 23(b)(2)

57. Class action status is appropriate because the Defendant plans to sweep and forcibly remove the homeless residents living at the public park will threaten all of the class members constitutional rights.

58.     The class seeks injunctive relief to ensure their constitutional protection against cruel and unusual punishment is upheld by preventing the City of St. Louis from forcibly removing them from the public park and threatening to punish them if they remain.

59.     Because the putative class challenges the Defendant's actions as unconstitutional through injunctive relief that would apply the same relief to every member of the class, Rule 23(b)(2) is appropriate and necessary.

60.     Further, a class action is a superior means, and the only practicable means, by which the Named Plaintiffs and unknown Class members can challenge the Defendant's unconstitutional actions and obtain the necessary immediate injunctive relief sought for themselves and all other members of the class.

### Appointment of Class Counsel Rule 23(g)

61.     Fed. R. Civ. P. 23(g). Federal Rule of Civil Procedure 23(g) requires that the court appoint class counsel for any class that is certified. Fed. R. Civ. P. 23(g)(1). Class counsel must "fairly and adequately represent the interests of the class."

62.     Based on their experience with this type of civil rights litigation, undersigned counsel meet the factors the court must consider under Rule 23 (g): (1) "the work counsel has done in identifying or investigating potential claims in this action"; 2) "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;" 3) "counsel's knowledge of the applicable law;" and 4) "the resources that counsel will commit to representing the class."

## **CLAIM FOR RELIEF**

## **COUNT I:**

**Defendant is violating Plaintiffs' Eighth Amendments Rights to be free from cruel and unusual punishment by threatening punishment against Plaintiff and the members of the proposed class based on their status as unhoused individuals, in violation of 42 U.S.C. § 1983.**

63. Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

64. Poverty, unemployment, untreated mental and physical illness, drug and alcohol dependence, and the City's failure to provide adequate shelter space often forces Plaintiff and other homeless individuals to sleep in public places in the City of St. Louis.

65. While these conditions contribute to chronic homelessness, they have been exacerbated by the COVID-19 public health crisis.

66. Rather than respond to the crisis by ensuring adequate shelter space is provided for these individuals, the City is instead threatening an encampment sweep and physical eviction of individuals from their temporary tent shelters in a publicly owned park.

67. The posted public health order itself references several municipal ordinances that it claims Plaintiff and other homeless individuals will be in violation of if they fail to comply with the Order to vacate.

68. Although Plaintiff and members of the proposed class are homeless and have no other option but to sleep outside in a public park, Defendant has threatened Plaintiff with criminal charges if she fails to vacate a tenant encampment located in a publicly owned park.

69. The Defendant is punishing Plaintiff and the other members of the proposed class based on their status as homeless persons with nowhere else to go.

70. The Defendant's actions penalize Plaintiff and members of the proposed class for their homeless status constitute cruel and unusual punishment in violation of Plaintiff;s well-established rights under the Eighth Amendment of the United States Constitution as incorporated in, and applied to the states through, the Fourteenth Amendment.

71. Because the April 29, 2020 City of St. Louis Public Health Order violates the freedom from cruel and unusual punishment guaranteed by the Eighth Amendment to the United States Constitution, Plaintiff and members of the proposed class are entitled under 28 U.S.C. §§ 2201-2202 to a declaratory judgment declaring that the Order is unconstitutional, or in the alternative, only to be interpreted in particular ways prescribed by this Court, to be constitutional.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays that this Court order the following relief enter preliminary and permanent injunctive relief:

a. Enjoining the City of St. Louis from  from forcibly removing individuals located in the public park in downtown St. Louis between Tucker Avenue and 18th Streets and between Market and Chestnut Streets unless Plaintiffs have provided accessible and appropriate shelter accommodations to each of the individuals experiencing homelessness who is currently sheltering in the park;

b. Enjoining the City of St. Louis from issuing any municipal citations or criminal citations to homeless individuals living in the above-referenced public park until accessible and appropriate shelter accommodations have been provided to each individual;

c. Certification of the class as defined above;

d. Award reasonable attorneys fees and costs; and

e. Provide any and all other relief as may be just and equitable.

Dated: May 1, 2020

Respectfully submitted,

By:    /s/ John Bonacorsi
ARCHCITY DEFENDERS, INC.
John Bonacorsi (MBE #71794MO)
Lee R. Camp (MBE #67072MO)
Maureen G. Hanlon (MBE #70990MO)
Jacki J. Langum (MBE # 58881MO)
Blake A. Strode (MBE #68422MO)
440 N. 4th Street, Suite 390
Saint Louis, MO 63102
314-361-8834
314-925-1307 (fax)