## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| RANATA FRANK, on behalf of herself and all others similarly situated, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | Case No.  4:20-cv-597 |
| THE CITY OF ST. LOUIS, | ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

Comes now Ranata Frank, Plaintiff, and for her Memorandum in Support of Plaintiffs' Motion for Temporary Restraining Order, states as follows:

## INTRODUCTION

While the City of St. Louis has instituted a number of public health directives during the COVID-19 pandemic—to do everything from closing playgrounds, schools, non-essential businesses, setting up testing locations, and issuing social distancing guidance, to an eventual Stay at Home order—it has never had an adequate plan in place to protect those experiencing housing instability and homelessness during this crisis.

## STATEMENT OF RELEVANT HISTORY

The City of St. Louis has a history of failing to provide essential services for its unhoused population. During the COVID-19 public health pandemic, that history has remained true.

*St. Louis is Unable to Provide Adequate Shelter Capacity for Unhoused Individuals*

1

The City of St. Louis has struggled to maintain its shelter capacity, much less make the needed expansion to provide shelter space for all unsheltered individuals. There are normally around 518 beds available for unhoused individuals in St. Louis. Rebecca Rivas, *Advocates Concerned about a COVID-19 Plan for Homeless in St. Louis City*, St. Louis American (Apr. 14, 2020), http://www.stlamerican.com/news/local_news/advocates-concerned-about-a-covid-19-plan-for-homeless-in-st-louis-city/article_3af8bd3c-7e9a-11ea-b3cd-d3ffbd0c679c.html. However, due to social distancing requirements, the number of shelter beds was reduced by around 40 percent to 308 beds, so that shelters could adequately comply with social distancing guidelines. *Id.*

It is clear that homeless individuals are at increased risk from the COVID-19 pandemic. *Others at Risk: People Experiencing Homelessness*, Centers for Disease Control (Apr. 13, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/homelessness.html (hereinafter CDC, People Experiencing Homelessness). The CDC issued interim guidance on preventing COVID-19 with this vulnerable population which emphasizes the need for individualized housing and instructs that, "Unless individual housing units are available, do not clear encampments during community spread of COVID-19. Clearing encampments can cause people to disperse throughout the community and break connections with service providers." *People Experiencing Homelessness and COVID-19: Interim Guidance*, Centers for Disease Control and Prevention (Mar. 22, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/homeless-shelters/unsheltered-homelessness.html. (hereinafter *CDC, Homelessness Interim Guidance*).

 With both inadequate shelter space and individual housing units available, on April 4, 2020, unhoused individuals living in parks near Market Street began setting up tents provided to

them by volunteer outreach workers. This was after no other provisions had been made for

sufficient housing a month after the first person tested positive for COVID-19 in the St. Louis

region. *See* Nicole Sanders, *One Month Passes Since First COVID-19 Case Reported in St. Louis

County*, KMOV (Apr. 7, 2020), https://www.kmov.com/news/one-month-passes-since-first-

covid-19-case-reported-in-st-louis-county/article_8b8cdb16-78c3-11ea-9762-

374386def558.html).

Two encampments emerged: one near 14th and Market, which consisted primarily of

single men, and another near Tucker and Market, which became known as the "family camp."

Complaint Ex. B. Service providers have begun regularly visiting these encampments to provide

meals, tents, tarps, and other supplies that people need to try and survive the current health

pandemic. *Id*. These service providers regularly help homeless individuals attempt to access

shelter beds, but are often told there are no accessible spaces. *Id*.

Weeks after the encampments were established, the City of St. Louis reported that it had

opened 200 additional shelter beds in response to the COVID-19 pandemic on April 29. The City

of St. Louis, *City of St. Louis Issues New Order to Protect the Public's Health and Safety During

COVID-19 Outbreak* (Apr. 29, 2020), https://www.stlouis-

mo.gov/government/departments/health/news/new-order-to-protect-public-health-and-safety-

encampments.cfm. But, the supposed new beds did nothing more than keep the number of shelter

beds available for individuals experiencing homelessness at the same numbers as they were prior

to the pandemic.

Although it is difficult to state exactly many shelter beds are physically available on any

given day, there are not enough shelter beds for homeless individuals to access. Complaint Ex.

A.. On April 30, according to a representative of the Department of Human Services, there were 98 people on a waitlist for shelter beds. Complaint Ex. A.

Nonprofit and volunteer outreach workers who are not associated with the City of St. Louis expressed that although they have helped individuals apply for shelter beds, they have not received a response to those applications. (Cohen Declaration) These outreach workers have worked directly with the members of the proposed class living in the downtown public park who are now the target of the Defendant's unconstitutional actions.

*Rather Than Provide Resources to the Homeless, Defendant Threatens Punishment*

While these failing patterns and practices are concerning lapses in public policy, it's the Defendant's threat to punish individuals for living outside that brings rise to these claims. Throughout the duration of the COVID-19 crisis, the City of St. Louis has terrorized those who have had no option but to remain homeless during the pandemic.

When the City of St. Louis issued its initial "Stay at Home" Order on March 21, 2020, no considerations were made for those who were unhoused and could not stay home. *Stay Home-Essential Activities Only Order*, Health Commissioner's Order No. 5 (Mar. 21, 2020), https://www.stlouis-mo.gov/government/departments/health/communicable-disease/covid-19/documents/upload/Health-Commission-s-Order-5-03-21-2020.pdf.

Rather than following the CDC guidance instructing cities to refrain from breaking up encampments to prevent community spread of COVID-19, on March 25,  SLMPD officers first entered the encampments to survey them. Complaint Ex. D. Over the next week, the officers instructed individuals to leave the encampments or face arrest for failing to comply. *Id*. This threatening behavior continued for several weeks with SLMPD officers visiting the encampments and threatening individuals with arrest if they did not move from the park. *Id*.

4

On April 9, a particularly threatening and traumatizing experience occurred when SLMPD officers and City of St. Louis Parks Department employees arrived at the encampments at approximately 4:00 AM with shovels and trucks to clear people's property if they did not immediately leave. *Id*. A group of outreach workers and volunteer observers confronted the City employees who eventually backed down from their demands and left that evening. *Id*.

While things appeared to have subsided, on April 29, the City of St. Louis publicly announced its intentions to forcibly remove individuals from the encampment in a Notice of Violations and Order to Vacate. Complaint Ex. B. The Order states individuals have to remove their belongings by 10:00 am on Friday, May 1 or face seizure of their property. *Id.* The Order also indicates that unhoused individuals are in violation of City of St. Louis ordinances (St. Louis City Municipal Code 15.10.010 and 25.32.020) by seeking shelter in the park by living in a tent and breaking park curfew. *Id.* In particular, the City states that people are violating park curfew by sleeping in the park after 10 p.m. *Id.* The order also states that "tents may not be used for residential occupancy under the ordinance of the City of St. Louis." *Id.*

The City of St. Louis dispatched individuals to deliver physical notices to those living in the park on the afternoon of April 29. This provided Ms. Frank and other homeless individuals with less than forty-eight hours notice that they had to vacate the park or else face forced removal by Defendant. Complaint Ex. B.These individuals are without anywhere to go and are struggling to access the allegedly-available shelter beds the City claims to have made available. Complaint Ex. E. Approximately fifty people remain at the public park with no option for alternative shelter on May 1. These individuals will face the threat of physical destruction of their personal property, physical deprivation of their temporary tent shelter homes, and the

imminent threat of facing criminal charges simply for having nowhere safe to go in the middle of a public health crisis.

## **LEGAL STANDARD**

District courts have "broad discretion when ruling on requests for preliminary injunctions."[1] *Manion v. Nagin*, 255 F.3d 535, 538 (8th Cir. 2001) (citation omitted). In determining whether to grant preliminary injunctive relief, courts consider the following factors: (1) the probability of success on the merits; (2) the threat of irreparable harm to the movant; (3) the balance between this harm and the injury that granting the injunction will inflict on the other interested parties; and (4) whether the issuance of an injunction is in the public interest. *Entergy, Arkansas, Inc. v. Nebraska*, 210 F.3d 887, 898 (8th Cir. 2000) (citation omitted). Although no single factor is dispositive, "the two most critical factors for a district court to consider in determining whether to grant a preliminary injunction are (1) the probability that plaintiff will succeed on the merits, and (2) whether the plaintiff will suffer irreparable harm if an injunction is not granted." *Chicago Stadium Corp. v. Scallen*, 530 F.2d 204, 206 (8th Cir. 1976). As Plaintiffs do not seek to enjoin the operation of a state statute, they need only show a "fair chance of prevailing" on the merits of the case in order to demonstrate a likelihood of success. *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008). Plaintiff easily meets this standard.

In this case, because there is a high likelihood Plaintiffs will succeed on the merits of their claim and, because Plaintiffs face a significant threat of irreparable harm if the City does

---

[1] Requests for temporary restraining orders and preliminary injunctions are evaluated using the same standard. *See*, *e.g.*, *Calvert v. Paniagua*, No. 2:17CV2 HEA, 2018 U.S. Dist. LEXIS 77279, at *27 (E.D. Mo. May 8, 2018); *A Place for Mom, Inc. v. Hochhalter*, No. 4:12cv0529 JAJ, 2012 U.S. Dist. LEXIS 199689, at *6 (S.D. Iowa Dec. 11, 2012).

follow through on forcibly removing homeless individuals from the encampments, injunctive

relief is necessary to make ensure Plaintiffs' constitutional rights under the Eighth Amendment

are protected.

## ARGUMENT

I.   **A TEMPORARY RESTRAINING ORDER SHOULD ISSUE BECAUSE THERE IS A SUBSTANTIAL LIKELIHOOD PLAINTIFFS WILL SUCCEED ON THEIR CLAIM THAT DEFENDANT'S ACTIONS WOULD VIOLATE THEIR EIGHTH AMENDMENT RIGHTS**

The Eighth Circuit has been clear that while no single factor is determinative, "the

probability of success factor is the most significant." *Home Instead, Inc. v. Florance*, 721 F.3d

494, 497 (8th Cir. 2013). A plaintiff need only have a "fair chance of prevailing," defined as no

greater than a fifty percent likelihood, to show a probability of success sufficient for preliminary

relief. *D.M. by Bao Xiong v. MN State High School League,* 917 F.3d 994, 999 (8th Cir. 2019).

Here, Plaintiffs have more than a fair chance of prevailing on their Eighth Amendment claim and

therefore a Temporary Restraining Order is appropriate.

The Eighth Amendment places limits on the State's ability to punish citizens. In addition

to "limit[ing] the kinds of punishment that can be imposed on those convicted of crimes," and

"proscrib [ing] punishment grossly disproportionate to the severity of the crime," the Eighth

Amendment also "imposes substantive limits on what can be made criminal and punished as

such." *Ingraham v. Wright,* 430 U.S. 651, 667, 97 S.Ct. 1401, 1410, 51 L.Ed.2d 711 (1977)

(internal citations omitted). As a result, it is impermissible under the Eighth Amendment to apply

criminal laws to punish a person's status, as opposed to their conduct. *See Robinson v.

California,* 370 U.S. 660, 666, 82 S.Ct. 1417, 1420, 8 L.Ed.2d 758 (1962) (state statute providing

criminal punishment for addiction to narcotics violates Eighth Amendment because it punishes

the status of being addicted to narcotics rather than the commission of any act); *United States v. Collier,* 478 F.2d 268, 273 (5th Cir. 1973) (recognizing distinction).

Here, Defendant's threat to displace or punish homeless individuals for living in a public park during the COVID-19 pandemic violates Plaintiffs' Eighth Amendment right to be free of cruel and unusual punishment because it punishes Plaintiffs' status of having nowhere else to go, rather than any voluntary conduct. Courts addressing Eighth Amendment claims in this context have held that sleeping in public becomes involuntary when there are no alternative accommodations available. *Martin v. City of Boise*, 920 F.3d 584 (9th Cir. 2019); *Pottinger v. Miami*, 810 F. Supp. 1551, 1554 (S.D. Fla. 1992). Where sleeping in public is not a voluntary act, ordinances or actions by the State that criminalize that practice are punishing the individual's status of having nowhere to go rather than criminal conduct.

> This principle compels the conclusion that the Eighth Amendment prohibits the imposition of criminal penalties for sitting, sleeping, or lying outside on public property for homeless individuals who cannot obtain shelter. … As a result, just as the state may not criminalize the state of being "homeless in public places," the state may not "criminalize conduct that is an unavoidable consequence of being homeless — namely sitting, lying, or sleeping on the streets.

*City of Boise*, 920 F.3d at  616 (*citing Jones v. City of Los Angeles*, 444 F.3d 1118, 1136 (9th Cir. 2006)); *see also Johnson v. City of Dallas*, 860 F. Supp. 344, 346 (N.D. Tex. 1994) (holding that as long as the homeless have no other place to be, they may not be prevented from sleeping in public); *Pottinger v. Miami*, 810 F. Supp. 1551, 1554 (S.D. Fla. 1992) (City's practice of arresting homeless individuals for harmless, involuntary conduct which they must perform in public is cruel and unusual in violation of the Eighth Amendment to the United States Constitution).

Thus, like the Ninth Circuit held in *Martin v. City of Boise,* while a municipality is not required to provide homeless citizens with somewhere to sleep; it also cannot punish those same

individuals for sleeping publicly where there are more homeless individuals than available shelter beds. *City of Boise*, 920 F.3d at 604 (citing *Jones*, 444 F3d at 1138).[2]

Here, the City of St. Louis is threatening to forcibly remove homeless individuals living in a public park with the threat that they could endure punishment for violating City ordinances regulating living in tents and being in a park after curfew. Similar to the homeless residents in *Boise* and the other cases described above, these residents have nowhere else to go. There are simply not enough beds available in the local shelters. Many homeless residents have attempted to avail themselves of shelter beds provided by the City of St. Louis without success. Complaint Ex. E; Complaint Ex. B.

Despite the lack of beds, if the residents do not immediately vacate their homes before 10 a.m. on May 1, they may be in violation of 576.030 of the Missouri Revised Statutes for interfering with government operations. They may also be in violation of one of two municipal ordinances, St. Louis City Municipal Code 15.10.010 and 25.32.020, that are specifically referenced in the April 29 Order.

While no homeless resident living in the park has been charged with a violation of the order because May 1 has not arrived, they still have standing to ask for injunctive relief from the threat of punishment. "To establish Article III standing, an injury must be concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013) (citation omitted). "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose,

---

[2] By contrast, the Court in *Joel v. City of Orlando*, 232 F.3d 1353, 1362 (11th Cir. 2000), upheld an anti-camping ordinance similar to the one discussed in *Boise*. However, an examination of the holding shows that the homeless residents living in Orlando never offered evidence that shelter beds were unavailable or at capacity. *Id*.

which is to ensure that the alleged injury is not too speculative for Article III purposes — that the injury is certainly impending." *Id*.

Here, the homeless residents living in the park are faced with an impending deadline where the threat of punishment is imminent. The law is clear that "[w]hen the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but prescribed by a statute, and there exists a credible threat of prosecution thereunder, he should not be required to await and undergo a criminal prosecution as the sole means of seeking relief." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979).

Because Plaintiffs have a high likelihood of successfully providing they will be deprived of their Eighth Amendment constitutional right to be free from cruel or unusual punishment, injunctive relief should be granted.

## II. PLAINTIFFS WILL SUFFER IMMEDIATE AND IRREPARABLE HARM IF DEFENDANT MOVES FORWARD WITH ITS PLAN TO FORCIBLY REMOVE HOMELESS INDIVIDUALS FROM THE DOWNTOWN PUBLIC PARK.

"Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Rogers Group, Inc. v. City of Fayetteville, Ark.*, 629 F.3d 784, 789 (8th Cir. 2010). A plaintiff succeeds in demonstrating a threat of irreparable harm by showing the harm is substantial, certain, and so imminent that there is a clear and present need for equitable relief. *Roudachevski v. All-Am. Care Centers, Inc.*, 648 F.3d 701, 706 (8th Cir. 2011) (internal citations omitted).

If Defendant is not enjoined from proceeding with their planned sweep and forcible removal of homeless individuals living at the downtown public park, Plaintiffs will suffer irreparable harm by having their constitutional rights deprived. Deprivation of constitutional rights "for even minimal periods of time, unquestionably constitutes irreparable harm." *Elrod v.*

*Burns*, 427 U.S. 347, 373 (1976); *M.B. v. Cors*i, No. 2:17-CV-04102-NKL, 2018 WL 5504178, at *5 (W.D. Mo. Oct. 29, 2018) ("A threat to a constitutional right is generally presumed to constitute irreparable harm."). The violation of one's Eighth Amendment rights are no exception. *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984) (holding allegation of violation of Eighth Amendment rights is a sufficient showing of irreparable harm). Further, when a violation of a plaintiff's constitutional rights also subjects the  plaintiff to criminal penalties, the threat of irreparable harm is established. *See Bloom v. O'Brien*, 841 F.Supp. 277, 279 (D.Minn. 1993).

If Defendant is not enjoined from proceeding with their planned sweep and physical removal of homeless individuals, it is certain that Plaintiffs will be forcefully removed from their encampment, separated from their belongings, and potentially cited for ordinance violations. This will cause several injuries to Plaintiffs which cannot be compensated by monetary damages.

If Defendant is not enjoined from proceeding with their planned sweep and physical removal of homeless individuals, Plaintiffs will also suffer irreparable harm through increased exposure to the COVID-19 virus.  The CDC has explicitly recognized that forcing unhoused individuals into congregate shelters or, worse, threatening jail time, creates additional risk of infection. Plaintiffs have a genuine, imminent concern of increased risk of COVID-19 through Defendant's actions. Courts throughout the United States have also recognized that where a movant's health is endangered, there is irreparable harm. *See Al-Joudi v. Bush*, 406 F. Supp. 2d 13, 20 (D.D.C. 2005); *Glenwood Bridge, Inc. v. City of Minneapolis,* 940 F.2d 367 (8th Cir. 1991) (finding intangible injuries, which are not 'easily valued or compensated' may support the need for preliminary relief.").  These concerns are magnified when the danger is to a vulnerable person. *Al-Joudi*, 406 F. Supp 2d at 13. Homeless individuals are undoubtedly some of the most

vulnerable citizens in our community and have been identified by the CDC as being at particular risk from COVID-19. (*CDC, People Experiencing Homelessness*).

Lastly, if Defendant is not enjoined from proceeding with their planned sweep and physical removal of homeless individuals, Plaintiffs will also suffer the immediate risk of being forced further into homelessness on the streets of the City of St. Louis with no consistent access to food, clothing, sanitation, or care—services being provided entirely by an army of outreach volunteers who are serving individuals living at the park—harms that can never be alleviated with compensation.

As described above, Plaintiffs face the threat of a substantial, certain and imminent harm illustrating a clear and present need for equitable relief. Further, because Plaintiffs have no way to be fully compensated for their damages, there is  no adequate remedy at law for their  harms. *Gen. Motors Corp. v. Harry Brown's LLC,* 563 F.ed 312, 319 (8th Cir. 2009).[3]

As such, Plaintiffs seek this court's entry of an order compelling Defendant to immediately halt its plans to forcibly remove individuals from living at the public park under the threat of punishment or arrest.

### III. PLAINTIFFS' INJURIES OUTWEIGH ANY POTENTIAL HARM TO DEFENDANT CAUSED BY THE GRANTING OF INJUNCTIVE RELIEF

"In each case, courts must balance the competing claims of injury and consider the effect of granting or withholding the requested relief, paying particular regard to the public consequences." *Winter v. NRDC, Inc.* 555 U.S. 7, 9 (2008) (citing *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)). The balance of equities generally weighs in favor of

---

[3] Unlike other cases in which courts have found adequate remedies at law, there is no statutory mechanism which specifically sets forth Plaintiff's recourse. *See, e.g., Watkins v. Lewis*, 346 F.3d 841, 847 (8th Cir. 2003) (finding adequate remedy at law when a statute permitted Plaintiffs to seek relief against deceptive trade practices).

constitutional rights. *See Kersten v. City of Mandan*, 389 F.Supp.3d 640, 647 (D.N.D. 2019) (finding balance of equities will favor protection of freedom of expression). So too, does the balance of equities tip in favor of a plaintiff when a Temporary Restraining Order will not require the defendant to take any action or obligate any funds. *Id*.

Here, the substantial injury faced by Plaintiffs, and lack of any real burden on Defendant, clearly weighs in favor of granting the injunctive relief. As discussed above, Plaintiffs face certain forced removal from their encampments, separation from their belongings, the possibility of criminal sanctions, and an increased risk of exposure to COVID-19. The granting of injunctive relief is also necessary to secure Plaintiffs Eighth Amendment Rights. Plaintiffs therefore face significant personal and constitutional injuries, which weighs in favor of granting injunctive relief. Conversely, with the granting of injunctive relief, Defendant will only be required to abstain from taking a certain action—the sweeping of the encampments. Defendant will not have to allocate any extra funds or take any specific action; and therefore will suffer minimal, if any, harms. Thus, the balance weighs strongly in favor of injunctive relief, which should be granted.

## IV. THE GRANTING OF INJUNCTIVE RELIEF WILL SERVE THE PUBLIC INTEREST

Issuing a temporary restraining order would serve the public interest by ensuring Plaintiffs' constitutional rights are protected and by protecting the general public from further community spread of COVID-19.

It is well established that the protection of constitutional rights is always in the public interest. *See Phelps–Roper v. Nixon,* 509 F.3d 480, 485 (8th Cir. 2007)*; see Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014) (upholding injunction and finding that public interest was served where injunction "will prevent constitutional deprivations.");

*Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights."); *Cento Tepeyac v. Montgomery Cty*., 722 F.3d 184, 191 (4th Cir. 2013) ("Upholding constitutional rights surely serves the public interest.") (internal citation omitted); *G & VLounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights.") (internal citation omitted); *Cortez IIIServ. Corp. v. Nat'l Aeronautics & Space Admin*., 950 F. Supp. 357, 363 (D.D.C. 1996) (public has an interest in upholding the Constitution). As described above, injunctive relief would prevent the violation of Plaintiffs' Eighth Amendment rights and, therefore, is in the public interest.

Further, the public generally has a direct interest in being protected from being exposed to community spread from the disbandment of these tent encampments. The CDC guidance regarding the disbandment of tent encampments where unhoused individuals are living is specifically geared towards preventing the spread of infections. (CDC, Homelessness Interim Guidance). This pointed guidance from the CDC instructs that unless individual housing units are available, encampments should not be cleared during community spread of COVID-19 due to the fact this can cause unhoused individuals to lose access to resources at the encampments, break connections with service providers, and disperse through the community. *Id.*  This can lead to increased risk of infection for those individuals. An increase in infections, particularly among high risk individuals, can lead to burdens on hospitals which can severely impact the public generally. Complaint Ex. C.

While Defendant claims that these encampments should be disbanded under the guise of public safety, in reality, they are defying federal public safety guidance and leaving unhoused individuals without access to regular services providers and with a higher likelihood that many of

those in the encampments will spread out into other communities. This presents an increased risk of infection to Plaintiffs; that risk of infection presents the danger of further spread and therefore also burdens the public as a whole.

Because all of the factors that inform the consideration of preliminary injunctive relief weigh in favor of a temporary restraining order. This Court should grant Plaintiffs motion, and issue a temporary restraining order halting the sweep of the encampments and the forced removal of Plaintiffs.

## V.  THE COURT SHOULD USE ITS DISCRETION TO WAIVE THE POSTING OF SECURITY

Federal Rule of Civil Procedure 65(c) provides that courts normally require the moving party to post security to protect the other party from any financial harm that is likely to be caused by a temporary injunction if that party is later found to have been wrongfully enjoined. The rule, however, provides district courts broad discretion to determine the amount of bond required or to waive the bond requirement altogether. *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1043 (8th Cir. 2016) (waiver of bond requirement warranted "where the damages resulting from a wrongful issuance of an injunction have not been shown.") (citations omitted). Waiver is appropriate in this case because Defendant is unlikely to suffer any harm from an injunction that requires them to follow the U.S. Constitution and provide Plaintiffs with relief that vindicates their fundamental constitutional rights. This alone is reason to waive the security requirement. *See, e.g., Council on American-Islamic Rels. v. Graubatz*, 667 F.Supp. 2d 67, 81 (D.D.C. 2009) (requiring no bond where the defendant would not be substantially injured by the issuance of an injunction); 11A Charles A. Wright, Arthur R. Miller, et al., *Federal Practice and Procedure* § 2954 (2d ed.) ("[T]he court may dispense with security altogether if the grant of an injunction carries no risk of monetary loss to the defendant.").

Plaintiffs are also "engaged in public-interest litigation, an area in which the courts have recognized an exception to the Rule 65 security requirement." *City of Atlanta v. Metro. Atlanta Rapid Transit Auto*, 636 F.2d 1084, 1094 (5th Cir. 1981). Moreover, Ms. Frank is indigent, as are all other similarly situated individuals that she seeks to represent, and their lack of financial resources is a central issue in this case. Many courts have waived bond requirements for indigent litigants in civil rights suits. *See, e.g., Johnson v. Bd. of Police Comm'rs*, 351 F.Supp. 2d 929, 952 (E.D. Mo. 2004) (waiving bond requirement for homeless plaintiffs). Thus, Plaintiffs ask this Court to waive the bond requirement under Rule 65(c).

## CONCLUSION

Homeless individuals already face precarious situations every day, must less in a time of public health crisis. The added threat of being punished for simply surviving is an irreparable harm that cannot be cured. As such, Plaintiffs respectfully request this Court enter an order compelling Defendant to immediately halt its plans to forcibly remove individuals from living at the public park under the threat of punishment or arrest and allow them to remain there until enough adequate individualized shelter space is available and accessible.

Dated: May 1, 2020                                      Respectfully submitted,

By:     /s/ John Bonacorsi
ARCHCITY DEFENDERS, INC.
John Bonacorsi (MBE #71794MO)
Lee R. Camp (MBE #67072MO)
Maureen G. Hanlon (MBE #70990MO)
Jacki J. Langum (MBE # 58881MO)
Blake A. Strode (MBE #68422MO)
440 N. 4th Street, Suite 390
Saint Louis, MO 63102
314-361-8834

314-925-1307 (fax)