## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| RANATA FRANK, on behalf of herself and all others similarly situated, ) ) ) | |
| Plaintiffs, ) ) | |
| v. ) ) | Case No. 4:20-CV-00597 SEP |
| THE CITY OF ST. LOUIS, ) ) | |
| Defendant. ) | |

## MEMORANDUM AND ORDER

This case lies at the intersection of two intractable social problems: homelessness and the Covid-19 pandemic. The parties disagree about how best to serve the needs of individuals experiencing homelessness in downtown St. Louis, Missouri, in light of the extraordinary complications caused by the novel coronavirus. Defendant, the City of St. Louis ("the City"), believes that the tent encampments that have developed in the area circumscribed by 10th and 18th Streets and Market and Chestnut Streets in downtown St. Louis pose a risk to the health of their occupants and the public, and therefore the City seeks to close those encampments and relocate their residents. Plaintiff Ranata Frank ("Ms. Frank"), a woman who has resided in one of the threatened encampments for the past month, believes that the City's closure of the encampment punishes her based on her homeless status in violation of her Eighth Amendment right to protection from cruel and unusual punishment.

Homelessness is an exceptionally complex phenomenon even when it is not exacerbated by a global pandemic. The Court admires all entities that work to address the scourge of homelessness—a category that includes both Plaintiff's counsel, the ArchCity Defenders, and Defendant, the City of St. Louis. The Court does not doubt the depth or sincerity of either

1

organization's concern for the individuals who reside in the encampments that are at the heart of this case. Nor does the Court express an opinion about the merits of either's approach to addressing those individuals' needs. This Court's role is not to evaluate competing policy prescriptions.

This case is before the Court on Plaintiffs' Motion for Temporary Restraining Order ("TRO"). Doc. [3]. Therefore, the sole question before this Court is whether Plaintiff has met the legal standard for obtaining the "extraordinary and drastic remedy" of an immediate injunction against the City's proposed course of action. *King v. Blake*, No. 4:08CV1050 RWS, 2009 WL 73678, at *1 (E.D. Mo. Jan. 9, 2009); *see also id.* ("The burden of proving that the relief should be awarded rests entirely on the movant."). Upon review of Plaintiff's Class Action Complaint (Doc. [1]) and supporting declarations; Plaintiffs' Motion for Temporary Restraining Order (Doc. [3]); affidavits submitted by Defendant in Opposition to Plaintiff's Motion for Temporary Restraining Order (Docs. [13], [18]); the City of St. Louis's April 29, 2020, Notice of Violations and Order to Vacate (Doc. [22], attached hereto as Exhibit A) ("Notice and Order"); and having heard oral argument, the Court finds that Ms. Frank has not met that burden, and therefore her motion must be denied.

## I.   Standard of Review

In determining whether to issue a TRO, the Court must consider the following four factors: (1) the threat of irreparable harm to the movant; (2) the balance between that harm and the harm that granting the injunction will inflict on other parties; (3) the probability that movant will prevail on the merits; and (4) the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc); *see also City of Berkeley, Missouri v. Ferguson-*

*Florissant Sch. Dist.*, No. 4:19CV168 RLW, 2019 WL 1558487, at *2 (E.D. Mo. Apr. 10, 2019). "While 'no single factor is determinative,' the probability of success factor is the most significant." *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013) (quoting *Dataphase*, 640 F.2d at 113 (internal citation omitted)). Therefore, the Court will begin its analysis there.

**II.     Discussion**

   *A. Plaintiff's likelihood of success on the merits*

Ms. Frank has not demonstrated that she is likely to succeed on the merits of her Eighth Amendment claim. Whether a citywide ban on homelessness amounts to the de facto criminalization of the status of being homeless, and whether such a de facto criminalization violates the Eighth Amendment, are questions of first impression in the Eighth Circuit. But the Court need not answer those questions here, because the City's Notice and Order is not a citywide ban on homelessness. Rather, it applies to only the tent encampments located near Market Street and Chestnut Street in downtown St. Louis. *See* Exh. A.

Ms. Frank's argument is grounded in the Eighth Amendment, which prohibits the use of criminal laws to punish a person's status as opposed to their conduct. Doc. [3-1] at 7 (citing *Robinson v. California*, 370 U.S. 660, 666 (1962)). Specifically, Ms. Frank accuses the City of punishing her for living in a public park, which, she asserts, punishes her status "of having nowhere else to go." *Id*. at 8. To support her position, Ms. Frank relies almost exclusively on the Ninth Circuit's holding *Martin v. City of Boise*, 920 F.3d 584 (9th Cir. 2019).

In *Martin*, six individuals experiencing homelessness brought an Eighth Amendment challenge against two city ordinances. *Martin*, 920 F.3d at 1035. The first ordinance made it "a

3

misdemeanor to use 'any of the streets, sidewalks, parks, or public places as a camping place at any time.'" *Id*. The second prohibited "'[o]ccupying, lodging, or sleeping in any building, structure, or public place, whether public or private ... without the permission of the owner or person entitled to possession or in control thereof.'" *Id*. The plaintiffs alleged—and the Ninth Circuit agreed—that the ordinances violated the Eighth Amendment "insofar as [they] impose[d] criminal sanctions against homeless individuals for sleeping outdoors, on public property, when no alternative shelter [was] available to them." *Id*.

The *Martin* court based its holding on the "substantive limits on what the government may criminalize" under the Eighth Amendment. *Id*. at 1046. Those substantive limits, the court explained, make it unconstitutional for the state to punish "'an involuntary act or condition if it is the unavoidable consequence of one's status or being.'" *Id*. at 1048 (quoting *Jones v. City of Los Angeles*, 444 F.3d 1118, 1135 (9th Cir. 2006)). "[J]ust as the state may not criminalize the state of being 'homeless in public places,'" the court noted, "the state may not 'criminalize conduct that is an unavoidable consequence of being homeless—namely sitting, lying, or sleeping on the streets.'" *Id*. (quoting *Jones*, 444 F.3d at 1137). From these principles, the court determined that the City's ordinances violated the Eighth Amendment's substantive limits.

But the *Martin* court cautioned that its holding was "a narrow one." *Id*. It held "only that 'so long as there is a greater number of homeless individuals in [a jurisdiction] than the number of available beds [in shelters],' the jurisdiction cannot prosecute homeless individuals for 'involuntarily sitting, lying, and sleeping in public.'" *Id*. (quoting *Jones*, 444 F.3d at 1137). Put differently, the *Martin* holding stands only for the proposition that "as long as there is no option of sleeping indoors, the government cannot criminalize indigent, homeless people for sleeping outdoors, on public property, on the false premise they had a choice in the matter." *Id*.

4

The facts of the present case differ from *Martin* in several important respects.  Chief among these differences is the scope of the cities' respective prohibitions.  In *Martin*, the City of Boise's ordinance was being enforced throughout the city.  Here, by contrast, the City's Notice and Order is expressly limited to only those encampments located near Market Street and Chestnut Street in downtown St. Louis.  The City's Director of Health testified that several encampments throughout the city remain open.  The inhabitants of the Market and Chestnut Street encampments are therefore free to sleep in other areas of the city without being in violation of the City's Notice and Order.

The City of St. Louis is therefore not criminalizing the state of being homeless or its unavoidable consequences, such as sleeping in public.  At most, the City is criminalizing sleeping in public *in a particular location*.  And according to Dr. Echols, as well as the Order to Vacate itself, the City is doing so because it has identified that particular location as especially "high risk . . for the spread of COVID-19. . . ."  Exh. A.  During times of public health crises, local governments have broad latitude to institute protective measures so long as those measures have "a 'real or substantial relation' to the public health crisis."  *In re Rutledge*, No. 20-1791, 2020 WL 1933122, at *5 (8th Cir. 2020) (quoting *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 31 (1905)).  The City's Notice and Order unquestionably has a real and substantial relation to the Covid-19 pandemic.  *See* Exh. A (identifying the encampment as "a serious health threat . . . due to the potential exposure and spread of COVID-19").

Furthermore, it is not at all clear that the City is criminalizing homelessness anywhere, even at the downtown encampments.  At oral argument, counsel for the City repeatedly stated that the City had no intention of arresting the individuals who have been residing at the encampments.  Rather, all evidence points to the City's intent being to ensure that those

individuals move from the encampments to safer alternative housing options. For example, the Notice and Order itself says nothing about criminal liability or penalties. Rather, after describing the risks associated with life in the encampment, it states:

> Through outreach over a period of two weeks, shelter and housing has [sic] been offered to individuals in the encampment and forty individuals have been placed in housing. Enough housing/shelter openings are available to house the approximately fifty individuals who have been sleeping in the tents in the current encampment. I encourage each individual to work with the Department of Health and the Department of Human Services to avail themselves of these no cost housing opportunities.

Exh. A at 1.

That brings the Court to its final point on this factor: the availability of alternative housing. Even if this Court were to follow the Ninth Circuit's holding in *Martin*, that holding would not compel the issuance of a TRO in this case. As previously explained, the *Martin* opinion is limited to instances where "there is no option of sleeping indoors." *Martin*, 920 F.3d at 1048. Here, the Notice and Order posted at the downtown encampments clearly states that sufficient alternative housing is available for everyone still sleeping there. Exh. A at 1. Dr. Echols reiterated that claim throughout his testimony, at one point noting that there were roughly 95 beds available this morning for the roughly 50 people remaining at the encampment. While Plaintiff's counsel expressed skepticism of that claim based on data relating to the St. Louis community more broadly, none of their arguments cast doubt on Dr. Echols's claim that the City had deliberately expanded its capacity and reserved spaces for the residents of the encampments in order to comply with the CDC's guidance that encampments should not be cleared "[u]nless individual housing units are available." Doc. [3-1] at 2 (citing *People Experiencing Homelessness and COVID-19: Interim Guidance*, Centers for Disease Control (Mar. 22, 2020)).

6

The available evidence therefore suggests that alternative housing is available to Plaintiff and the other current residents of the encampments.[1]

Because the City's order to vacate is limited in scope, because there is no evidence that Ms. Frank faces a genuine threat of criminal punishment, and because the City has represented that it is capable of housing every resident of the current encampment, the Court cannot find that Ms. Frank is likely to succeed on her Eighth Amendment claim.

### B. *Threat of irreparable harm to Plaintiff*

The next TRO factor the Court considers is the threat of irreparable harm to Ms. Frank if her request for a temporary restraining order is denied. "To succeed in demonstrating a threat of irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Powell v. Noble*, 798 F.3d 690, 702 (8th Cir. 2015) (quoting *S.J.W. ex rel. Wilson v. Lee's Summit R–7 Sch. Dist.*, 696 F.3d 771, 778 (8th Cir. 2012) (internal quotation marks omitted)).

Ms. Frank lists four potential harms she believes she will suffer unless the Court grants her request for a TRO. First, she claims she will suffer the deprivation of her constitutional rights. Doc. [3-1] at 10. Second, she claims she will be forcefully removed from the encampment, separated from her belongings, and cited for ordinance violations. *Id*. at 11. Third, she claims she will be exposed to increased risk of contracting Covid-19. *Id*. Finally, she claims

---

[1] Plaintiff does aver that she has sought accommodation in a shelter unsuccessfully several times since November 2019, and that she recently sought a room in a hotel but no one ever followed up with her, despite promising that they would. *See* Doc. [1-5]. In response, the City includes an affidavit from the Chief Program Manager of the City of St. Louis Department of Human Services attesting that she arranged a hotel room for Ms. Frank and her partner but was unable to locate her thereafter. *See* Doc. [18-1]. Therefore, notwithstanding Ms. Frank's past inability to find shelter, the evidence still supports the City's claim to have space for her now.

7

she will be "forced into further homelessness." *Id*. at 12.  The Court will consider each claim in turn.

While the deprivation of Eighth Amendment rights certainly would constitute irreparable harm, the Court has already explained that it is doubtful Ms. Frank will succeed in showing a violation of her Eighth Amendment rights.  Accordingly, Ms. Frank cannot rely on that claim to demonstrate a threat of irreparable harm.  *Powell*, 798 F.3d at 702 ("[A]s we have concluded Powell is unlikely to succeed in showing his First Amendment rights have been violated, we agree with the district court that Powell has not shown a threat of irreparable harm that warrants preliminary injunctive relief.").

The Court is not persuaded that Ms. Frank is at risk of forceful removal, separation from her belongings, or citation.  Ms. Frank cites no evidence that those outcomes are likely, and the Notice and Order and hearing testimony both suggest that they are not.  *See* Section III.A, *supra*; *see also, e.g.*, Exh. A at 2 (ordering that residents' personal items be stored at a secure location for up to 30 days with instructions for how to retrieve them).  Those harms are therefore not "certain and great and of such imminence that there is a clear and present need for equitable relief."  *Powell*, 798 F.3d at 702.

The third harm Ms. Frank lists is likewise contradicted by testimony from the City's public health expert, Dr. Echols.  As noted above, while the Centers for Disease Control has counseled against disbanding homeless encampments in general, that advice is subject to a critical exception: "[u]nless individual housing units are available."  Here, the City has taken pains to bring its public health initiative in line with the CDC's guidance by ensuring that it has an individual housing unit available for every displaced resident of the encampments.  The Court is hesitant to use its equitable powers to second-guess the reasonable and informed decisions of

public health experts.  *See also McDougall v. County of Ventura California*, No. 20-CV-02927-CBM-(ASx), 2020 WL 2078246, at *2 (C.D. Cal. Apr. 1, 2020) (deferring to county government's determination as to how to combat the spread of Covid-19).

The final harm Ms. Frank lists is also contrary to the weight of the evidence.  Rather than forcing her further into homelessness, the evidence presented suggests Ms. Frank's access to "food, clothing, sanitation, [and] care" (Doc. [3-1] at 12) would be improved by the City's Notice and Order.  Therefore, the Court cannot find that this harm is certain or imminent.

### C. & D.  *Potential harm to the City and the public interest*

The City's interest in this case is the effective containment of the Covid-19 virus and the protection of public health.  Thus, the Court's analysis of the third and fourth factors converge.  There can be little doubt that the public interest heavily favors the City's ability to take steps to prevent the spread of this deadly disease.  As the Eighth Circuit recently observed, the world "is in the midst of an unprecedented health crisis occasioned by the worldwide COVID-19 pandemic. Every day, the number of people infected with COVID-19 continues to rise, along with the virus's death toll." *In re Rutledge*, 2020 WL 1933122, at *1.  The Court cannot say that a temporary restraining order prohibiting the City from taking the steps it reasonably deems necessary to slow the spread of Covid-19 serves the public interest.

## III.   Conclusion

Because none of the four *Dataphase* factors weighs in Ms. Frank's favor, the Court finds that she has not met her burden to justify the "extraordinary and drastic remedy" of a temporary restraining order.  *King*, 2009 WL 73678, at *1.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Temporary Restraining Order (Doc. [3]) is DENIED.

**IT IS FURTHER ORDERED** that this matter is set for a preliminary injunction hearing on **Tuesday, May 12, 2020, at 10 AM**.

Dated this 2nd day of May, 2020.

Sarah E. Pitlyk
United States District Judge